UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| SHAUN ROBINSON, | Case No. 3:16-cv-00372-MMD-WGC |
|---|---|
| Plaintiff, | |
| v. | ORDER |
| RENOWN REGIONAL MEDICAL CENTER, *et al.*, | |
| Defendants. | |

**I.    SUMMARY**

Plaintiff Shaun Robinson has three claims remaining after the Court's resolution of Defendant Renown Health's ("Renown")[1] motion to dismiss: gender discrimination (claim two), harassment based on gender (claim five), and unequal pay (claim six). (ECF No. 77.) The parties have both moved for summary judgment. (ECF Nos. 68, 85.) The Court has reviewed the briefs relating to these motions. (ECF Nos. 76, 81, 87, 88.[2]) For the reasons discussed herein, the Court grants Defendant's motion and denies Plaintiff's motion.

**II.   RELEVANT BACKGROUND**

Plaintiff Shaun Robinson, a Caucasian man, obtained a license as a Certified Nursing Assistant ("CNA") from the Nevada State Board of Nursing on October 1, 2013. (ECF No. 85-3 at 8.) On November 18, 2013, Plaintiff was offered a CNA position in

---

[1] Defendant asserts that Renown is incorrectly named as "Renown Regional Medical Center." (ECF No. 85 at 1.)

[2] An additional exhibit and corrected exhibits are found at ECF Nos. 69, 89.

Renown's Telemetry 8 unit after interviewing with Alma Medina, a female and the Nurse Manager for Renown's Telemetry 8 unit. (ECF No. 68-5 at 1-4; ECF No. 85-13 at 3.) Medina made the decision to hire Plaintiff and was involved in Defendant's decision to terminate Plaintiff's employment less than a year later, on October 16, 2014. (ECF No. 85-13 at 3, 8-9.)

Under Renown's policies, CNAs serve as assistants to a licensed nurse; they are required to timely and accurately communicate with the nurse assigned to the CNA's patients. (ECF No. 85-13 at 3; ECF No. 85-3 at 18; ECF No. 85-14; ECF No. 85-16.) CNAs are also required to record the patients' vital signs in Renown's medical records management system referred to as EPIC. (ECF No. 85-13 at 3.) The nurses in turn rely on the information entered in EPIC to make decisions about patient care, and "if vital signs are entered incorrectly, the consequences to the patient could be extremely dangerous." (*Id.*)

In Renown's Telemetry 8 unit, CNAs are required to record patient's vitals every four hours. (ECF No. 85-13 at 3.) During Plaintiff's shifts, vitals were taken three times a day for normal patients—at 8:00 a.m., 12:00 p.m., and 4:00 p.m. (ECF No. 85-3 at 34.)

In Plaintiff's 90-Day Introductory Evaluation ("Evaluation"), he was given a "needs development" rating in 7 of the 9 areas covered in the Evaluation. (ECF No. 85-21.) Plaintiff did not agree with the Evaluation and provided a response to demonstrate his disagreement. (ECF No. 85-22.)

In late August 2014, Allie Saunders, a female supervisor and Charge Nurse, informed Medina that Plaintiff failed to follow Saunders' instructions relating to a patient who was a high fall risk, required assistance getting out of bed, and required turning every two hours. (ECF No. 85-13 at 5.) That same day, Medina also learned from a float nurse that Plaintiff failed to record any vital signs for one of that nurse's patients. (*Id.*) As a result, Plaintiff was given a Notice of Corrective Action on September 9, 2014 ("the Corrective Action"). (*Id.*; ECF No. 85-40.) Plaintiff disagreed with the issues raised in the Corrective Action. (ECF No. 85-3 at 31.)

On October 1, 2014, Registered Nurse ("RN") Krista Stryker, a female, reported to Saunders that the medical records of Stryker's assigned patient who was being monitored for sepsis reflected that Plaintiff had switched the patient's noon vital signs with the 4:00 p.m. vital signs. (ECF No. 85-13 at 6-7; ECF No. 85-39; ECF No. 85-48 at 11.) In particular, Stryker had noticed that Plaintiff had flopped the patient's noon vitals with the patient's 4:00 pm. vitals; Plaintiff did not make any notes to explain the reason for the switch. (ECF No. 85-48 at 11-12.) That morning, during the CNA bedside report Stryker had directed Plaintiff to take the patient's temperature, which he did. (ECF No. 85-3 at 34.) In the midafternoon, Stryker called Plaintiff to ask him why he had not entered the patient's noon vitals, and he verbally relayed the noon vitals to Stryker. (*Id.*). Plaintiff initially entered the patient's noon temperature of 100.9 degrees at 4:44 p.m. (ECF No. 49; ECF No. 7; ECF No. 85-52; ECF No. 85-53.) About two hours later, at 6:13 p.m., Plaintiff changed the noon temperature from 100.9 degrees to 97 degrees. (*Id.*) At the same time, Plaintiff input 100.9 degrees as the patient's 4:00 p.m. temperature. (*Id.*) Plaintiff failed to include any explanation for these changes in EPIC as required.[3] (ECF

///
///

---

[3] In response to Defendant's motion, Plaintiff disputes that he was required to explain the reason for the changes. (ECF No. 87 at 8.) However, Plaintiff offers no evidence to support his contention that "there is no policy requiring that notes be entered." (*Id.*) Plaintiff insists that EPIC "tracks all of the changes that are made," suggesting it was unnecessary to include notes explaining the reason for the changes. (*Id.*) This contention does not address Medina's concerns that Plaintiff did not include a note in EPIC to explain the reason Plaintiff changed the patient's noon vital signs and the reason Plaintiff failed to document the patient's vital signs during his shift. (ECF No. 85-13 at 8.) In Plaintiff's reply brief, he challenges Medina's statement that on occasions when vitals are entered incorrectly, Renown's policy and practice required that a note be placed in EPIC to explain the reason for the correction. (ECF No. 81 at 4, citing ECF No. 76-30 at 4.) Plaintiff insists that Defendant's CNA Orientation and HRM.810 do not even mention the word "note." (ECF No. 81 at 4.) However, even if these two documents do not address making notes in EPIC to correct an error, Plaintiff does not dispute Medina's statement that "CNAs are trained to document the reasons that any entries into EPIC are changed after the fact." (ECF No. 76-30 at 4.) Plaintiff fails to offer evidence to dispute Defendant's evidence offered through Medina's declaration that CNAs are required to note in EPIC the reason for changing a patient's vital signs after the fact. Indeed, it defies commonsense to not include an explanation for why information about a patient's vital signs was modified after the information had been entered. Plaintiff also asserts that he did explain the reason he changed the patient's vitals after the fact, but his assertions
*(fn. cont…)*

No. 85-3 at 35; ECF No. 85-13 at 7.) Plaintiff asserted that he made a mistake in recording the vitals and decided to correct his mistake, and he tried to contact Stryker "and used the chain of command[] but was not successful."[4] (ECF No. 85-13 at 7-8; ECF No. 87 at 7-8.)

During Plaintiff's next scheduled shift on October 8, 2014, Medina met with Plaintiff concerning the October 1, 2014 incident. (ECF No. 85-13 at 7-8.) After their discussion, Medina suspended Plaintiff pending further investigation. (*Id.*) On October 16, 2014, Plaintiff's employment was terminated for falsification of company records and incompetence in job performance. (ECF No. 85-67.)

### III. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral*

---

*(…fn.cont.)*
all go to his claimed attempts to notify Stryker and other individuals in the "chain of command"; they do not go to why he failed to document the reason for the changes in the first place. (*See* ECF No. 87 at 7-8.)

[4]Plaintiff insists that he tried to call Stryker to report the patient's noon vital signs. (ECF No. 81 t 12.) He left a message for Medina after 5:00 p.m. on October 1, 2014, to report that he was not able to reach Stryker to inform her of the patient's elevated 4:00 p.m. temperature. (ECF No. 85-13 at 7.)

4

*Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

Further, "when parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 499 (Feb. 1992)). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id.*

**IV. DISCUSSION**

Plaintiff seeks summary judgment on two of his three remaining claims—gender discrimination and gender harassment. (ECF No. 68.) Defendant moves for summary judgment on all three remaining claims—gender discrimination, gender harassment, and discrimination in compensation. (ECF No. 85.) Plaintiff did not respond to Defendant's motion with respect to his Equal Pay Act claim. (ECF No. 87.) The Court agrees with

1  Defendant that summary judgment on Plaintiff's Equal Pay Act claim is appropriate because Defendant has offered undisputed evidence that Plaintiff was not paid a starting wage of $11.30 because of his gender. (ECF No. 85 at 28-29.) The Court will grant summary judgment in favor of Defendant on this claim.

The arguments and evidence in support of the parties' motions and oppositions as to the remaining two claims are so intertwined that the Court will address the claims as presented instead of addressing the separate motions in order to avoid duplication.

### A. Gender Discrimination

To maintain a claim for Title VII discrimination, a plaintiff must either (1) produce direct evidence demonstrating the employer's conduct was, more likely than not, motivated by a discriminatory reason, or (2) satisfy the factors of the *McDonnell Douglas* burden-shifting framework. *Surell v. Cal. Water Serv.*, 518 F.3d 1097, 1105 (9th Cir. 2008). Here, the parties agree that the *McDonnell Douglas* burden-shifting analysis applies to Plaintiff's gender discrimination claim. (ECF No. 68 at 7; ECF No. 85 at 21.)

Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden to establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The plaintiff must show that (1) he is a member of a protected class, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) similarly situated employees outside his protected class were treated more favorably. *Leong v. Potter,* 347 F.3d 1117, 1124 (9th Cir. 2003) (*citing McDonnel Douglas*, 411 U.S. at 802). If the plaintiff meets his burden, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its conduct. *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003), *as amended* (Jan. 2, 2004). If the employer provides such a reason, the burden shifts back to the plaintiff to prove that the employer's reason is a pretext for discrimination. *Id.* "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the /// plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

1. ***Prima Facie* Case**

Plaintiff asserts that he was subjected to a number of adverse employment actions, including termination, discriminatory evaluations, discriminatory corrective actions, investigation for alleged harassment, investigation into the incident that led to his termination, failure to investigate Plaintiff's complaints, and refusal to provide a letter of recommendation to be submitted with Plaintiff's application to the University of Washington School of Nursing. (ECF No. 68 at 9, 11-20.)

First and foremost, not all of this alleged conduct amounts to adverse employment actions. Under Title VII, an adverse employment action is one that "materially affect[s] the compensation, terms, conditions, or privileges of ... employment." *Chuang v. Univ. of Cal., Davis Bd. of Trs,* 225 F.3d 1115, 1126 (9th Cir. 2000) The Ninth Circuit has held that various forms of conduct amount to adverse employment actions. *See, e.g., Davis v. Team Elec. Co.,* 520 F.3d 1080, 1090 (9th Cir.2008) (holding that an employee's exclusion from an important area of the workplace, together with discriminatory allocation of hazardous work assignments, materially affected the terms and conditions of the employee's employment); *Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 818–19 (9th Cir.2002) (holding that assignment of more, or more burdensome, work responsibilities constitutes adverse employment action). However, adverse employment action does not cover rude or offensive comments or mere ostracism. *See Kortan v. Cal. Youth Auth.,* 217 F.3d 1104, 1112–13 (9th Cir.2000) (finding that the plaintiff did not suffer an adverse employment action when she was repeatedly mocked and treated with hostility).

The Court agrees with Defendant that the refusal to provide a letter of recommendation for Plaintiff to apply to nursing school is not an adverse employment action because it did not affect Plaintiff's employment with Renown. (ECF No. 85 at 22.) Investigating complaints of alleged harassment and failing to investigate Plaintiff's complaints about other employees are not adverse employment actions because Plaintiff has not demonstrated that these actions affected his terms and conditions of employment. *See Chuang* 225 F.3d at 1126 (holding that employer's failure to

investigation plaintiffs' complaints about misappropriation of their research funds did not amount to adverse employment action). Moreover, Plaintiff was not disciplined as a result of the investigation into complaints of his alleged harassment of another employee. As for the investigation relating to the incident in March 2014 "for 'touching' Sonia Torres' leg," Plaintiff asserts that the "investigation resulted in Plaintiff returning to work, and being paid for his suspension." (ECF No. 68 at 15.) Thus, that investigation ultimately did not affect Plaintiff's terms of employment.

Even assuming that these alleged actions amount to adverse employment actions, Plaintiff fails to offer evidence to support the fourth factor that similarly situated employees outside of his protected class—female CNAs—were treated more favorably. Plaintiff compares himself to female licensed nurses, but they are not similarly situated to him because Plaintiff's job as the CNA was to assist the licensed nurse and report to the licensed nurse or manager on duty. (ECF No. 85-16; ECF No. 85-14.) Setting aside this deficiency, Plaintiff offers no evidence to support his assertion that "he was given corrective actions that, for the same exact event, nurses were not." (ECF No. 68 at 9.) The evidence Plaintiff cites to does not support his assertion that nurses who engaged in the same conduct were not disciplined. Renown similarly points to the absence of any evidence to show that nursing professionals who made changes to patients' medical records after the fact without including an explanation were not disciplined or terminated. (ECF No. 85 at 23.)

Plaintiff argues that Stryker was the RN on duty for the majority of his patients, but she was not disciplined or held responsible for not documenting the vitals for the patient for which he was disciplined. (ECF No. 68 at 10.) He also insists that Saunders and Medina were part of the same health care team on the day of the incident that led to his termination and were not held responsible. (ECF No. 87 at 16.) Again, Stryker, as the RN, was not similarly situated to Plaintiff; Saunders, as the Charge Nurse, and Medina, as the Nurse Manager, were also not similarly situated to Plaintiff. Moreover, the undisputed evidence is that Plaintiff failed to timely take the patient's vitals and then

1 changed the patient's vitals afterward without providing an explanation in EPIC. These failings were not attributable to Stryker, Saunders or Medina.

Plaintiff also argues that he was treated differently in that Renown asked Saunders and Stryker for a written explanation but he was not asked to provide a written explanation relating to the October 1, 2014, incident. (ECF No. 68 at 12.) This dissimilar treatment is again of no import. Plaintiff was given the opportunity to provide an explanation in his interview with Medina. (ECF No. 85-13 at 7-8.)

"The requisite degree of proof necessary to establish a prima facie case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). Here, Plaintiff has not met even this "minimal" degree of proof. He offers no evidence to support his contention, or to create a genuine issue of fact for trial, that similarly situated employees outside of his protected class were treated more favorably.

### 2. Legitimate Business Reasons

Even assuming that Plaintiff has demonstrated a *prima facie* case of gender discrimination, the Court agrees with Defendant that it has offered legitimate non-discriminatory reasons for the actions about which Plaintiff complains. Defendant offered evidence to support that (1) Plaintiff's employment was terminated for falsification of company records and incompetence because he changed a patient's vital records without providing an explanation and failing to timely and accurately communicate patient vitals with the licensed nurse after having been previously warned (ECF No. 85-13 at 7-8; ECF No. 85-67); (2) Plaintiff was given a "needs development" rating in 7 of the 9 areas covered in the evaluation (ECF No. 85-21); and (3) Plaintiff was counseled

///
///
///
///

9

about the need to improve his communication[5] and his documentation[6] (ECF No. 68-6 at 2; ECF No. 76-3 at 24; ECF No. 76-47 at 3-4.) Defendant has therefore satisfied its burden of articulating legitimate non-discriminatory reasons for the employment actions taken against Plaintiff.

### 3. Pretext

Pretext may be shown by "directly persuading the court that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Stegall v. Citadel Broad. Co.,* 350 F.3d 1061, 1066 (9th Cir. 2003) (quoting *Burdine*, 450 U.S. at 256)). Where the plaintiff relies on circumstantial evidence that the defendant's motives were different than its proffered motives, evidence of pretext must be "specific" and "substantial" to survive summary judgment. *Id.* (citation omitted).

Plaintiff argues that Defendant's proffered reason for his termination is a pretext for discrimination because Defendant did not cite to any adverse effect on the patient whose vitals were changed in response to Plaintiff's interrogatory asking for the "'adverse effects' to the patient." (ECF No. 87 at 6 (citing to ECF No. 87-2 at 4).) Defendant's response to that interrogatory was: "Plaintiff failed to timely notify a licensed nurse of the patient's vital signs so that the licensed nurse could determine the necessity of further medical intervention." (ECF No. 87-2 at 4.) Whether the patient suffered harm

///

---

[5]The Performance identified "Practices good communication with handoff for patients and customers" as "Expectations" for Plaintiff. (ECF No. 68-6 at 2.) Examples provided included: "Verbal and written communications are unclear; needs to improve communication with nurses and other CNAs especially regarding changes in patient status/patient needs." (*Id.*)

[6]Renown asserts in its opposition to Plaintiff's motion that "the same performance issues related to communication and documentation that were identified in [Plaintiff's] 90-day introductory evaluation, were reiterated in his September 9th Corrective Action and ultimately led to his termination." (ECF No. 76 at 22.) Plaintiff disputes that the issue of documentation was addressed in his Evaluation. (ECF No. 81 at 5.) Plaintiff is correct that the Evaluation did not specifically identify documentation as an issue. (ECF No. 68-6.) However, Plaintiff was counseled about the need to properly document during the meeting to address the Corrective Action. (ECF No. 76-3 at 24.)

is unimportant for purposes of Plaintiff's claim because Defendant's proffered reason for Plaintiff's termination was not because of actual harm to the patient.[7]

Plaintiff also generally argues that Defendant's proffered reasons for the actions taken against him were pretextual because he "was a male in a predominantly female profession" (ECF No. 68 at 15), he was treated differently than other female CNAs because he is a male CNA (*id.* at 15-10), all supervisors were women, and those who were involved in his termination were women (*id.* at 19-24; ECF No. 87 at 12). However, the examples Plaintiff provided involve contentions about how Renown conducted investigations into the March 2014 alleged "touching" of another employee by Plaintiff and into the October 1, 2014, incident that led to his termination, along with other complaints about how others treated him.[8] Plaintiff also generally argues that his Evaluation and the Corrective Action were given because of his gender, but he offers no evidence to support this assertion other than pointing to the all-female supervising staff. (ECF No. 87 at 12.) The Court agrees with Defendant that these allegations are not "specific" and "substantial" evidence that Renown's proffered reasons for Plaintiff's discipline and termination were a pretext to discriminate against Plaintiff because of his gender.

Moreover, Defendant insists that the employment decisions here were not made because of Plaintiff's gender because Medina, who made the decision to hire Plaintiff, was involved in Plaintiff's performance evaluation, Corrective Action and employment termination less than a year later. (ECF No. 85 at 24; ECF No. 85-13 at 3-6.) The Court agrees. "[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." *Bradley v. Harcourt, Brace &*

---

[7] Defendant insists that its discipline policy does not require "adverse effect" to patients. (ECF No. 88 at 5, citing Renown's discipline and appeal policy (ECF No. 85-11).)

[8] There is no evidence that those other co-workers were involved in making the decisions relating to Plaintiff's discipline or employment termination.

*Co.,* 104 F.3d 267, 271-72 (9th Cir. 1996) (finding that because the same supervisor who terminated plaintiff's employment hired her about a year earlier, the claim that the supervisor wanted a male in the position is at best suspicious); *see Coleman v. Quaker Oats Co.,* 231 F.3d 1271, 1286 (9th Cir. 2000) (finding that plaintiff's claim of gender discrimination was weakened by the fact that the person who decided not to rehire plaintiff initially was the same person who created a different position for plaintiff). Because of Medina's involvement in Plaintiff's hiring and the challenged employment actions, Defendant has shown a strong inference of the absence of any discriminatory animus, and Plaintiff's general assertions about an all-female supervising staff and the lack of male CNAs are not enough to rebut this inference.

Plaintiff also contends that Mandy Roberts' comment "that men have a hard time in healthcare" demonstrates her animus against men. (ECF No. 87 at 11-12, citing to Roberts' declaration.) However, Roberts states in her declaration that at the end of their meeting to discuss Plaintiff's Evaluation, she "mentioned that being a CNA can be challenging, and that in Telemetry 8, [they] often had elderly female patients who were extremely modest . . . [and] where elderly female patients are concerned, it can be tough on male CNAs because these patients do not like to be helped by the opposite sex, especially when it came to using the restroom or washing." (ECF No. 85-20 at 4.) Plaintiff's characterization of Roberts' comments is at best inaccurate. But even accepting Plaintiff's characterization and viewing Roberts' comments in the light most favorable to Plaintiff as the non-moving party on Defendant's motion, Roberts' comment is not "substantial" or "specific" evidence of pretext.

**B. Harassment Based on Gender**

Plaintiff's motion relies on the following conduct to allege harassment based on gender: (1) Plaintiff was a male CNA and "the only male among 12 other female CNAs," and a majority of the nurses and supervisory staff and "a very involved" Senior Human Resources representative were women (ECF No. 68 at 21); (2) these women "sabotaged Plaintiff's work performance and were 'psychologically aggressive'" (*id.* at 22); (3)

12

1 Plaintiff was the subject of investigation in March and October 2014 with some of these female employees which "insinuates wrong-doing" (*id.* at 2); (4); these investigations reveal that Plaintiff was referred to as "creepy," a "dumbass," "very creepy" and "weird" (*id.*); (5) Plaintiff experienced "ridicule" and "female coworkers would literally vacate the break room when [he] came in," and nurses would ignore Plaintiff's calls which would result in more work for him and in him being subjected to corrective action (*id.* at 24). Plaintiff cites to his Amended Complaint (ECF No. 13) as support for some of these allegations.[9] Even accepting these allegations as true, the Court agrees with Defendant that there is no evidence that these alleged forms of conduct were taken because of Plaintiff's gender and they are not sufficiently severe or pervasive to support Plaintiff's harassment claim.

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "*discriminat[ion]* ... because of ... sex." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998). To establish harassment based on gender, a plaintiff must show that: (1) plaintiff was subjected to physical or verbal conduct; (2) the conduct was made based on gender; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the employee's employment and create an abusive work environment. *See Westendorf v. West Coast Contractors of Nevada, Inc.*, 712 F.3d 417, 421 (9th Cir. 2013); *Vasquez*, 349 F.3d at 642.

"To determine whether conduct was sufficiently severe or pervasive to violate Title VII, we look at 'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Vasquez,* 349 F.3d at 642 (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001)). "The required level of severity or seriousness 'varies inversely

///

---

[9]In its reply, Defendant points to Plaintiff's deposition testimony where he testified that the name calling—being called "weird," "creepy" or "dumb ass"—described the alleged harassment that he experienced. (ECF No. 88 at 8, citing ECF No. 85-3 at 39.)

13

1 with the pervasiveness or frequency of the conduct.'" *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001) (quoting *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991)).

The alleged comments here are not even analogous to those found insufficiently severe or pervasive in *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1111 (9th Cir. 2000) and *Westendorf*, 712 F.3d at 421-22. In *Kortan*, the Ninth Circuit found that harassment was not severe or pervasive when the plaintiff's supervisor referred to females as "castrating bitches," "Madonnas," or "Regina" in front of plaintiff on several occasions and directly called plaintiff "Medea." *Kortan,* 217 F.3d at 1111. In *Westendorf,* the court found that a supervisor's comments about "girly work," "Double D" to refer to large breasted women, tampons and whether women "got off" using a particular kind, and orgasms and how women were lucky to get multiple were not sufficiently severe or pervasive. *Westendorf,* 712 F.3d at 419-22.

As the Supreme Court has observed, Title VII "does not set forth a general civility code for the American workplace." *Oncale,* 523 U.S. at 80*.* Here, the alleged conduct that Plaintiff relies on at best demonstrates that his female coworkers may not have been courteous or professional, but they do not show that the conduct was made because of Plaintiff's gender nor do they rise to the level of severe or pervasiveness required to support a claim of harassment based on gender.

**V.     CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the parties' motions.

It is therefore ordered that Plaintiff's Motion for Summary (ECF No. 68) is denied.

It is further ordered that Defendant's Motion for Summary Judgment (ECF No. 85) is granted.

///

The Clerk is directed to enter judgment in favor of Defendant Renown Health and close this case.

DATED THIS 23rd day of March 2018.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE